Andrew G. Deiss (Utah Bar № 7184)
DEISS LAW PC
10 West 100 South, Suite 700
Salt Lake City, UT 84101
Telephone: (801) 433-0226
deiss@deisslaw.com

*Attorney for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MAX MARMER, an individual, JONATHAN RONCA, an individual, GILLIAN POTHIER, an individual, JEFF MARMER, an individual, PEGGETH LOEB, an individual, JOSEPH REISS, an individual, BRANDON BOZARTH, an individual, STANLEY DAWEJKO, an individual, MICHAEL POLE, an individual, and MULTIDIMENSIONAL CAPITAL, a California-based limited partnership,<br><br>    *Plaintiffs,*<br><br>v.<br><br>JOSEPH P. FIRMAGE, an individual, ROBERT A. RICHARDS, an individual, KENNETH E. WILBER, an individual, COLIN BIGELOW, an individual, INTEGRAL INITIATIVES LLC, a Colorado-based company, 21C CORPORATION, a Colorado-based corporation, SCIENCE INVENTS LLC, Utah-based company, MOTION PHYSICS LLC, a Utah-based company, MANYONE LLC, a Utah-based company, and UNKNOWN DEFENDANTS 1-10, inclusive,<br><br>    *Defendants.* | **COMPLAINT**<br><br>**JURY DEMANDED**<br><br>Case No.<br><br>Judge |

**COMPLAINT**

The above-named Plaintiffs, by and through counsel, hereby bring this action against the above-named Defendants. Plaintiffs allege and state as follows:

**INTRODUCTION**

Defendant Joseph P. Firmage ("Joe Firmage" or "Firmage") is a business entrepreneur who claimed to have devised a concept for a new and radical form of propulsion technology. Firmage is or was purportedly actively engaged in the research and development of such technology ("Firmage's Lab Project" or "the Lab Project"). The remaining Defendants are a collection of individuals and entities associated with Firmage and his Lab Project. For many years, Defendants have worked together to solicit investment funds for the Lab Project under pretenses that were either misleading or outright false, including from the Plaintiffs bringing this action.

Firmage and his associates (including the remaining Defendants) induced the Plaintiffs to invest in the Lab Project, by falsely claiming that they had been awarded several large federal government contracts to develop and produce his new propulsion technology, but needed short-term "bridge" financing to, among other things, secure certain intellectual property rights and fund the lab's operations until the government contract funds were to be disbursed. Defendants offered Plaintiffs a substantial stake in what was promised to be a hugely lucrative venture, backed by personal guaranties and other significant financial protections if the project failed.

In reality, the Lab Project had been at a dead-end since at least 2019, and Firmage's concept for a new form of propulsion technology had been discredited by multiple scientists. Firmage is heavily indebted to multiple creditors and uses new investment funds to pay off his past debts. Additionally, Plaintiffs have been informed that Firmage has connections with international criminal organizations which take a substantial portion of new investment money.

Many of the Defendants—most prominently, Defendant Robert A. Richards ("Bob Richards" or "Richards")—are themselves former investors who lost money financing Firmage's failed Lab Project in the past. In an effort to recoup their losses, they made a deal with Firmage that in exchange for inducing individuals to invest, they would receive kickbacks or commissions. The Defendants turned Firmage's Lab Project into a Ponzi scheme, recovering their past losses and enriching themselves by luring investors into financing a project that they knew had no potential to succeed.

In recruiting new investors, Defendants targeted members of the Integral Theory Community ("the Integral Community" or "the Community")—a philosophical movement headed by Defendant Kenneth E. Wilber ("Ken Wilber" or "Wilber")—which includes many of the Plaintiffs bringing this action. Defendants exploited their connections to this tight-knit community to garner the implicit trust of those they attempt to recruit as new investors in the Lab Project. By presenting themselves as like-minded and trustworthy confidants who were devoted to helping their fellow "integralists", they induce the individuals they target to relax the care and vigilance they would ordinarily exercise in making investment decisions.

Plaintiffs are individuals or entities located throughout the United States who made a series of investments in the Lab Project during the period March through July of 2022 on the false promise of a freshly-awarded $200 million government contract to fund the project.

As is seen all too often, Plaintiffs' investment money did not go towards its intended purpose. The money was not used for the development of promising new propulsion technologies, nor for the successful closing of government contracts. Instead, their invested funds were diverted to line Defendants' pockets, contribute to paying off Firmage's many debts, and—it is believed—fund international organized crime. Consequently, Plaintiffs have received zero returns from their investments.

Through this suit, Plaintiffs seek to recover their losses from Firmage and those who perpetuated the fraudulent scheme to their benefit. Plaintiffs seek a full recovery for the loss of their investments, lost profits, opportunity costs, punitive damages, attorneys' fees and all other legally cognizable damages based on the claims set forth below.

## **THE PARTIES**

1. Plaintiff Max Marmer is an individual residing in Los Angeles, California.

2. Marmer is the lead Plaintiff in this case; the remaining Plaintiffs' investments were made through him.

3. Plaintiff Jonathan Ronca is an individual residing in Austin, Texas.

4. Plaintiff Gillian Pother is an individual residing in Los Angeles, California.

5. Plaintiff Jeff Marmer is an individual residing in San Francisco, California.

6. Plaintiff Peggeth Loeb is an individual residing in San Francisco, California.

7. Plaintiff Joseph Reiss is an individual residing in San Francisco, California.

8. Plaintiff Brandon Bozarth is an individual residing in Austin, Texas.

9. Plaintiff Stanley Dawejko is an individual residing in Philadelphia, Pennsylvania.

10. Plaintiff Michael Pole is an individual residing in Austin, Texas.

11. Plaintiff Multidimensional Capital is a Limited Partnership operated primarily out of Los Angeles, California.

12. Defendant Joseph P. Firmage is an individual residing in Salt Lake City, Utah.

13. Firmage is the creator and manager of the Lab Project, which purported to develop an experimental form of propulsion technology.

14. Defendant Science Invents LLC is an expired LLC operating primarily out of Salt Lake City, Utah and controlled by Firmage.

15. Defendant Motion Physics LLC is an expired LLC operating primarily out of Salt Lake City, Utah and controlled by Firmage.

16. Defendant ManyOne LLC is an expired LLC operating primarily out of Salt Lake City, Utah and controlled by Firmage.

17. Defendant ManyOne World LLC is an expired LLC operating primarily out of Salt Lake City, Utah and controlled by Firmage.

18. Defendant the Academy of Science and Arts LLC is an expired LLC operating primarily out of Salt Lake City, Utah and controlled by Firmage.

19. Defendant the National Academy of Science and Arts LLC dba InterNASA is an expired LLC operating primarily out of Salt Lake City, Utah and controlled by Firmage.

20. Defendant InterNASA LLC is an expired LLC operating primarily out of Salt Lake City, Utah and controlled by Firmage.

21. Defendants Joseph P. Firmage, Science Invents LLC, Motion Physics LLC, ManyOne LLC, ManyOne World LLC, The National Academy of Science and Arts LLC dba InterNASA, and InterNASA LLC, are herein collectively referred to as "Firmage and associated entities".

22. Defendant Robert A. Richards is an individual residing in Boulder, Colorado.

23. Richards is a business associate of Firmage who has helped market his Lab Project to potential investors, including to the Plaintiffs bringing this action.

24. Defendant 21C Corporation ("21C") is a corporation operating primarily out of Boulder, Colorado and controlled by Richards.

25. Defendant Kenneth E. Wilber ("Wilber") is an individual residing in Denver, Colorado.

26. Wilber is a writer and contemporary philosopher who founded the Integral Theory movement.

27. Wilber is also an associate of Richards and Firmage.

28. Wilber has been involved with the Lab Project since at least September 20, 2016.

29. Defendant Integral Initiatives LLC ("Integral Initiatives") is a company operating primarily out of Denver, Colorado controlled by Richards and Wilber.

30. Defendant Colin Bigelow ("Bigelow") is an individual residing in Denver, Colorado.

31. Bigelow is an associate of Wilber's.

32. Bigelow has been involved with the Lab Project since at least July 31, 2017.

33. Defendants Richards, Wilber, Bigelow, and Integral Initiatives are herein collectively referred to as the "Integral Initiatives Parties".

34. Defendant Paula Collins A.K.A. Paulette Collins ("Collins") is an individual residing in Atlanta, Georgia.

35. Collins is a friend of Firmage's.

36. Collins has known Firmage since they were colleagues at a company called USWeb in the late 1990s.

37. Collins is also involved in the Lab Project and has promoted its successes on conference calls with investors.

38. Collins also assists Firmage in handling transactions involving investment funds.

39. Defendant Virginia Menlove ("Menlove") is an individual residing in Salt Lake City, Utah.

40. Menlove is Firmage's late father's former girlfriend.

41. Menlove has supported Firmage financially several times in the past.

42. Firmage lived in Menlove's home during the time period relevant to this action.

43. At Firmage's direction, Menlove handled many financial transactions involving Plaintiffs' investment funds.

44. Defendant David Hestenes ("Hestenes") is an individual residing in Phoenix, Arizona.

45. Hestenes is a Professor Emeritus at Arizona State University.

46. Hestenes is a theoretical physicist whose scholarship focused on spacetime algebra.

47. Hestenes is associated with Firmage and involved in his Lab Project.

48. Hestenes' connection to Firmage's Lab Project has been used to endorse its scientific viability.

49. Hestenes has recruited other investors to the Lab Project who are not party to this action.

50. Defendant Jairo Toro ("Toro") is an individual residing in Salt Lake City, Utah.

51. Toro is Firmage's boyfriend.

52. Toro handled transactions involving a portion of Plaintiffs' investment funds.

53. Toro was paid a commission for his services to the Lab Project.

54. Unknown Defendants 1–10 are unknown to Plaintiffs or unable to be identified prior to formal discovery in this litigation.

## JURISDICTION

55. Pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa, this Court has original subject matter jurisdiction over the claims alleged in this action arising under the laws of the United States, including specifically the Plaintiffs' claims asserted under 15 U.S.C. §

78j(b) (including S.E.C. Rule 10b-5 promulgated thereunder and codified at 17 C.F.R. §240.10b-5), 15 U.S.C. §78t(a), and 15 U.S.C. §77l.

56.  The Court has supplemental jurisdiction over the claims asserted herein under state law pursuant to 28 U.S.C. § 1367 because such claims are so related to the claims arising under the laws of the United States that they form part of the same case or controversy under Article III of the United States Constitution.

57.  Venue is appropriate in this forum pursuant to 28 U.S.C. § 1391 (b)(2) and 15 U.S.C. § 78aa.

## GENERAL FACTS AND ALLEGATIONS

*Firmage and Richards Solicit Plaintiffs' First Investment*

58.  In April 2022, Max Marmer was introduced to Joe Firmage and Bob Richards.

59.  Firmage and Richards presented Marmer with an investment opportunity supporting the research and development of an advanced propulsion technology project.

60.  Richards told Marmer that Firmage was an associate of Ken Wilber.

61.  Wilber is a contemporary philosopher and the developer of Integral Theory.

62.  Marmer is a member of the Integral Theory Community, a group of individuals who strive to apply Wilber's theory in their lives.

63.  Marmer held Wilber in high regard, as his works have been highly influential in Marmer's life.

64. Richards told Marmer that, because Marmer was a trusted fellow member of the Community, Richards and Firmage were particularly interested in involving Marmer in the Lab Project.

65. Richards also told Marmer that many other members of the Integral Community had invested heavily in the project over the years.

66. The past investors Richards mentioned included nonparty Terry Patten ("Terry"), a good friend of Marmer's.

67. Other past investors Richards mentioned included nonparties Rollie Stanich ("Stanich") and Roger Walsh ("Walsh"), two prominent members of the Community with whom Marmer was familiar and whom he respected.

68. Firmage and Richards told Marmer that Firmage was the former CEO of a publicly traded multibillion-dollar web services company.

69. Firmage and Richards told Marmer that Firmage was a venture capitalist and public philanthropist, funding several non-profit organizations with which Marmer was personally familiar through a series of million-dollar personal donations.[1]

70. Firmage and Richards told Marmer that Firmage was an experienced government contractor and consultant, holding multimillion-dollar contracts with the United States Department of Defense since the age of 20 and maintaining an ongoing consulting relationship with the department.

---

[1] These included the Integral Institute, which is run by Wilber, and the Institute of Noetic Sciences, or I.O.N.S.

71. Firmage and Richards told Marmer that Firmage was a significant backer of cutting-edge theoretical physics research, personally investing approximately $30 million to support advances in the field through his personal lab.

72. Firmage and Richards, represented to Marmer that David Hestenes, Professor Emeritus at Arizona State University and a renowned theoretical physicist whose scholarship focused on spacetime algebra, had been engaged as a technical advisor and promoter of the Lab Project.

73. Firmage and Richards, among others, represented to Marmer that Hestenes fully backed Firmage and his Lab Project—going so far as to bet a significant portion of his legacy on them.

74. Richards went so far as to say Hestenes was betting a significant portion of his legacy on Firmage and his project.

75. Firmage and Richards told Marmer that Firmage had already developed nine prototype machines, which he designated Versions 0.1 through 0.9.

76. Firmage and Richards told Marmer that Firmage and associated entities needed just under $1.5 million to finish developing Version 1.0 of the prototype machine.

77. Firmage and Richards told Marmer that Version 1.0 would be capable of achieving nine seconds of controlled flight.

78. Firmage and Richards told Marmer that Firmage had a family legacy of government involvement.

79. Firmage and Richards told Marmer that Firmage's father, Edwin Firmage, was a respected constitutional scholar with close ties to several presidential administrations.

80. Firmage and Richards told Marmer that the United States Department of Defense ("DOD") had recently expressed an interest in the Lab Project.

81. Firmage and Richards told Marmer that retired United States Army General Wesley Clark had visited theLab Project facilities many times over the years and was impressed with the team's work.

82. Firmage and Richards told Marmer that in February 2022, the Biden Administration had offered Firmage's lab two large government contracts, including a $200 million contract with DOD ("the DOD Contract").

83. Firmage told Marmer the contracts had already been signed.

84. Firmage said he could not show the contracts to Marmer because they were classified and protected by a Non-Disclosure Agreement.

85. Richards reassured Marmer that even if the government contracts fell through, finishing Version 1.0 would "open the floodgates" of private venture capital funding.

86. To secure the DOD Contract and receive the $200 million check, Firmage and Richards represented that it was necessary to finalize the purchase of certain intellectual property rights.

87. Firmage and Richards told Marmer that securing the intellectual property rights could only be accomplished by placing $1 million into a government escrow account.

88. Firmage and Richards offered Marmer the opportunity to put money towards the escrow payment in exchange for a share of the subsequent project profits.

89. Based on Firmage and Richards' representations that Firmage had extensive experience negotiating and executing government contracts and enjoyed the trust and

12

confidence of several leaders in the theoretical physics community, Marmer regarded Firmage as an authority on this process.

90. Additionally, Marmer trusted that, before pursuing the DOD Contract, Firmage had performed the necessary due diligence work and exercised his professional discernment informed by decades of experience.

91. Furthermore, Marmer had the endorsements of Richards—and Wilber as his business partner—as careful investors, whom he trusted and regarded highly.

92. Richards represented that he and Wilber had done extensive due diligence on Firmage and his technology.

93. Richards further represented that he and Wilber had spent many hours with lawyers formalizing and securing their protective rights.

94. Because of their shared membership in the Integral Community, Marmer regarded Richards and Wilber as leaders and role models who he believed would not abuse their authoritative representation to lure many members of the Integral Community, including friends and collaborators, into a scheme to enrich themselves.

95. On April 12, 2022, Marmer and his family invested $35,000 in Lab Project.

96. At Richards and Firmage's direction, half of the money was paid via direct wire transfer to Firmage's personal bank account, and the other half was wired to Integral Initiatives LLC, an entity jointly owned and controlled by Richards and Wilber.

97. The investment agreement included options to purchase shares in a "Revenues Royalty" program.

98. The investment was backed by a personal guaranty by Joseph Firmage.

13

99.  The investment was also secured by conditional IP rights.

100.  The investment was further secured by reimbursement through the sale of shares to third-party funders.

101.  Through this first investment, said Firmage, Marmer and the other Plaintiffs would become "Founding Members" of Science Invests, LLC, a company purportedly formed by Firmage to manage and market the Lab Project.

*Firmage and Richards Solicit Plaintiffs' Second Investment*

102.  One week later, Richards and Firmage informed Marmer that another Founding Member had pulled out of the deal, leaving a $125,000 deficit in the escrow funds.

103.  Richards and Firmage invited Marmer to attend a meeting with Firmage and another potential replacement investor.

104.  Firmage offered the other potential investor very favorable terms if they would agree to cover the $125,000 deficit in funds.

105.  The other potential investor expressed a willingness to accept the deal, but indicated they would not be able to provide the funds very quickly.

106.  Marmer suggested that he and his investor group would be able to supply the funds sooner than the alternate potential investor if offered the same favorable terms.

107.  Firmage accepted Marmer's offer.

108.  On April 21, 2022, Marmer wired $125,000 to 21C Corporation, an entity controlled by Richards.

109.  Marmer's second investment was secured by the same extensive protections described in paragraphs 94-97 above, plus an additional protection whereby Firmage would subordinate his own claim to certain IP rights to Marmer, and Marmer's claim would be *pari passu* with that of Integral Initiatives LLC.

110.  Over the next month, Firmage and Richards told Marmer that the DOD Contract had successfully closed.

111.  These claims were bolstered by frequent communications Firmage claimed to have with government officials in Washington, D.C. to discuss details of the Lab Project.

112.  At an investor update meeting on May 1, 2022, Marmer met Paula Collins, a longtime friend and associate of Firmage's.

113.  Collins at various times offered her endorsement of  Lab Project.

114.  Collins stated that Hestenes had characterized the Lab Project as a significant scientific breakthrough.

115.  Collins further stated that Hestenes had endorsed the Lab Project as being based on sound science.

116.  Beginning June 21, 2022, Firmage and Richards gave various assurances to Marmer that Firmage had already received the money from the DOD contract.

117.  Firmage produced to Marmer copies of checks and bank statements that he purported were payments connected with the DOD contract.

118.  In fact, Marmer later discovered, these checks and bank statements were falsified.

*Firmage and Richards Solicit Plaintiffs' Third and Fourth Investments*

119.  Around that same time, Firmage and Richards asked Marmer for additional investment money.

120.  Firmage and Richards claimed that some additional bridge capital was required to fund the Lab Project and cover operating expenses for the lab until the government funds were released.

121.  Marmer and his investment group provided Firmage and Richards two bridge funding investments of $284,000 and $222,717, respectively.

122.  In making these additional investments, Marmer relied on Firmage and Richards' assurances that they were already in possession of the government funds from the DOD contract.

123.  They were all memorialized in written agreements, each signed by Defendant Firmage and the respective Plaintiff(s) lending the money in question.

124.  Most of the agreements specified due dates by which Firmage and associated entities were obligated to repay the money invested by Plaintiffs.

125.  These due dates varied by individual agreement, but the latest due date specified in any one agreement was August 5, 2022.

126.  In total, Marmer and the other Plaintiffs had invested $666,717 between March 2022 and July 2022.

127.  Plaintiffs have received zero returns on their investments.

128.  At Firmage's direction, the bridge funding disbursements were divided into numerous payments made to several different individuals and entities and using a variety of means, including money-sharing apps, bank transfers, and checks.

129.  On July 14, 2022, Marmer sent $3,000 to Firmage's boyfriend Jairo Toro via Venmo.

130.  On July 24, 2022, Marmer sent an additional $1,500 Venmo payment to Toro.

131.  Toro indicated to Marmer that he kept a few hundred dollars from these payments and sent the rest to Firmage.

132.  In July 2022, Toro texted Firmage, saying he hoped that Marmer's visit to Salt Lake City that same month wouldn't "cause a big mess."

133.  On information and belief, Toro was aware of Firmage's fraudulent activities.

134.  During the time period relevant to this action, Marmer made Apple Cash payments totalling $700 to Virginia Menlove.

135.  Marmer made several wire transfers to a bank account which was jointly controlled by Firmage and Menlove.

136.  Firmage has also signed Professional Services Agreements with Richards, Bigelow, Collins, and Hestenes, whereby these Defendants "act as facilitators of inbound money transfers under my sole authority and discretion."

*Marmer Grows Suspicious of Firmage's Lab Project*

137.  Beginning around May 2022, after continuous delays and ongoing requests for cash, Marmer began to suspect that the nature of the lab's work and the DOD Contract had been misrepresented to him.

138.  On May 10, 2022, Marmer confronted Richards about his suspicions that Firmage was engaging in fraudulent behavior.

139.  Richards assured Marmer that Firmage "wouldn't know how to fake something like this."

140.  Citing his involvement with the project over many years, Richards reinforced the soundness of Marmer's investment by stating that the technology being developed was real and would have a significant impact on the world.

141.  Richards stated that their purported government contacts had highly sophisticated technical capabilities such as detailed monitoring of their smartphones.

142.  Richards proffered that the only alternative explanation for these capabilities would be that a sophisticated foreign intelligence agency was impersonating US government officials in order to steal the technology they were developing

143.  Richards contended that this validated the significance of their accomplishments, because "people don't fight over worthless things."

*Marmer Begins Investigating Firmage's Lab Project, Uncovers Fraud*

144.  Marmer visited Salt Lake City in July 2022 to meet with Firmage.

18

145. Marmer witnessed Menlove writing several checks, each for amounts greater than $30,000, to unknown individuals and entities.

146. Firmage directed Menlove to write the checks.

147. These checks drew from Plaintiffs' investment funds, effectively diverting them for purposes unrelated to the Lab Project.

148. On July 28, 2022, at Marmer's insistence, Firmage arranged for Marmer to speak with "Christopher", a purported government agent whom Firmage referred to as his "government handler" for the DOD contract.

149. Marmer did so and had a phone conversation with Firmage and "Christopher".

150. "Christopher" spoke in poor, broken English.

151. "Christopher" gave no information denoting any level of knowledge of the project.

152. "Christopher" offered no proof of government affiliation.

153. "Christopher" dodged each of Marmer's questions.

154. "Christopher" encouraged Marmer to invest more money to Firmage.

155. This interaction affirmed Marmer's suspicions that there was never any DOD Contract.

156. Through his own investigative efforts and the work of a private investigator, Marmer discovered information suggesting that "Christopher" belonged to a large foreign criminal organization.

157. Marmer contacted several other former investors and associates of Firmage who had conducted investigations of their own and reached similar conclusions.

158.  In August 2022, Richards sent Marmer wire receipts showing what happened to a portion of the money Marmer invested for the purpose of putting in a government escrow account.

159.  The wire receipts showed that on April 25, 2022, Defendant Richards sent two wire transfers of $80,000 and $31,000, respectively, to two unknown entities based in Japan.

160.  The money transferred to Japanese entities was paid from a bank account belonging to Integral Initiatives LLC.

161.  Also in August 2022, Marmer spoke with David Hestenes ("Hestenes") about the research supposedly being conducted by the Lab Project.

162.  Hestenes stated that Firmage had proved nothing more than a phenomenon he referred to as "the washing machine effect".

163.  Hestenes further stated that Firmage and Richards had not come remotely close to creating the kind of propulsion technology they claimed to have developed.

164.  Hestenes disavowed any purported connection to the Lab Project.

165.  Hestenes expressed unequivocally that Firmage, Richards, and Collins had misrepresented his endorsement of the Lab Project.

166.  Hestenes further claimed that he had no financial ties to Firmage.

167.  A few days later, Marmer spoke with Firmage's Lead Engineer, Robert Leatham ("Leatham").

168.  Leatham confirmed that Firmage had grossly overstated what had been achieved in the lab.

169. Leatham added that they were still in a "basic research" phase, which was to say they were not only far from being able to create a marketable product, they hadn't even determined whether Firmage's concept for advanced propulsion technology was actually possible.

170. On information and belief, Hestenes was, in fact, heavily involved in the Ponzi scheme, having recruited another investor in February 2022, just two months before Marmer became involved.

171. This investor whom Hestenes recruited eventually lost over $700,000 investing in Firmage's Lab Project.

172. According to one former investor who spoke with Marmer, Hestenes also received financial kickbacks from Firmage through a scheme involving commercial property in Arizona called the Icehouse ("the Icehouse Scheme").

173. Hestenes owns the Icehouse.

174. The Icehouse Scheme worked as follows: Firmage would put up earnest money to buy the Icehouse, then cancel the sale, leaving Hestenes with the earnest money.

175. Hestenes has received at least $100,000 from Firmage through the Icehouse Scheme.

176. The existence of the Icehouse Scheme was confirmed by Firmage's attorney.

177. In September 2022, Richards informed Marmer that Hestenes had invested new money with Firmage.

178. As Marmer continued his investigation, he got in contact with several other former investors in Firmage's Lab Project.

179.  Each of the former investors with whom Marmer communicated had lost hundreds of thousands of dollars through Firmage and Richards' Ponzi scheme.

180.  One former investor stated that he informed Richards that Firmage was connected to international organized crime shortly before Marmer became involved in the Lab Project.

181.  Several months after Marmer realized he had been defrauded, he reached out to Michael Patten ("Michael"), the son of his friend Terry Patten ("Terry") who, as discussed above in paragraph 64, had also invested heavily in Firmage's Lab Project. Terry and Max had been friends since 2012 but Terry passed away in October 2021.

182.  Marmer learned from Michael that Terry was also caught up in Firmage's scam and had lost all his life savings in the process.

183.  In communicating with Michael, Marmer discovered that Defendants Richards, Wilber, and Bigelow had been involved in Firmage's scam for many years.

184.  Michael sent Marmer a document outlining agreements between Firmage and the Integral Initiative Parties whereby they would receive commissions and other compensation in exchange for recruiting new investors in an effort to recoup their own losses from past investments in Firmage's fraudulent Lab Project.[2]

185.  In effect, Firmage and the Integral Initiative Parties had agreed to perpetuate a Ponzi scheme.

---

[2] *See* Exhibit A.

186.  The 50% compensation the Integral Initiative Parties agreed to was consistent with Richards and Firmage's request described in paragraph 93 above that the payment of Marmer's first investment be split 50-50 between Firmage and Integral Initiatives LLC.

187.  Marmer also discovered that in September 2021, Firmage and Richards assured Terry that they had already received the $200 million check for the DOD contract.

188.  Firmage and Richards produced fake checks and bank statements to Terry in order to corroborate their claim.

189.  Firmage and Richards showed Terry the same $200 million check that Richards and Firmage would later claim could only be obtained if Marmer first contributed funds to an escrow account.

190.  Marmer visited Salt Lake City in July 2022 to meet with Firmage.

191.  Marmer witnessed Menlove writing several checks, each for amounts greater than $30,000, to unknown individuals and entities.

192.  Firmage directed Menlove to write the checks.

193.  These checks drew from Plaintiffs' investment funds, effectively diverting them for purposes unrelated to the Lab Project.

194.  On information and belief, Firmage has a history of substance abuse, mental illness, and financial insecurity—including significant indebtedness to a long list of creditors—which seriously impede his ability to responsibly manage the lab and its resources.

195. On information and belief, Firmage regularly uses his portion of new investments in his Lab Project to pay off outstanding debts and send money to international criminal organizations.

196. At no point did Richards take any action to alert o inform Marmer or any member of his group of any of the issues surrounding Firmage's Lab Project, despite his access to relevant evidence of such, and despite explicit questions from Marmer inquiring after them.

197. To the contrary, the Integral Initiatives Parties, Hestenes, and Collins collaborated with Firmage to project confidence in Science Invents, the DOD Contract, the lab, and the technology they were developing, perpetuating the Ponzi scheme built on Firmage's fraud.

198. Richards presented the Integral Initiatives Parties as the lead investors in the Lab Project, who had been working with Firmage for over 7 years and held him in high trust and regard.

199. Furthermore, Richards led Marmer to believe that the Integral Initiatives Parties had negotiated comfortable protections for themselves and their fellow "Founding Members"—including Marmer—forestalling possible losses.

200. Richards went so far as to lie about the circumstances surrounding investor exits and banking irregularities flagged by Marmer—concocting a narrative which blamed any issues on malicious former investors.

201. Richards was Marmer's primary contact during his time investing in Firmage's Lab Project.

202. On information and belief, Richards orchestrated Marmer's recruitment into the Science Invents Ponzi scheme.

203. On information and belief, the Integral Initiatives Parties received a portion of Plaintiffs' investments in Science Invents.

204. On information and belief, the Science Invents Ponzi scheme has defrauded investors of approximately $25 million.

205. Multiple sources have informed Plaintiffs that this scheme continues to operate, trapping other unsuspecting investors into massive, fraudulent financial commitments.

## MISREPRESENTATIONS AND OMISSIONS

206. Plaintiffs invested in Science Invents based on misrepresentations and omissions made by Firmage and Richards, including, but not limited to, the statements detailed below.

## FRAUDULENT MISREPRESENTATIONS

207. When Marmer first met Firmage and Richards in March 2022, they told him that through the application of advanced theoretical and experimental physics, Firmage had discovered a revolutionary form of propulsion.

(a) This representation was false.

(b) Firmage had not made any novel scientific discoveries nor developed any new propulsion technologies.

(c) The representation concerned a material fact in that it induced Plaintiffs to invest in the project.

(d) Defendants knew or should have known this representation was false because they either led or had a long association with the Lab Project and would have been familiar with the state of its research.

208. In March 2022, Firmage and Richards told Marmer that Firmage had already produced nine prototype machines demonstrating his new propulsive technology concept.

(a) This representation was false.

(b) While Firmage had created some machines out of motorcycle wheels and remote-control model parts which he referred to as prototypes, their only demonstrated capability was, at most, spinning the wheels at a few thousand revolutions per minute.

(c) The so-called prototypes did not remotely demonstrate any antigravity or aerospace propulsion capabilities.

(d) This representation concerned a material fact as it altered the mix of information available to Plaintiffs in making their investment decisions and thereby induced them to invest.

(e) Specifically, it assured Plaintiffs that Firmage had already demonstrated the viability of his concept through the production of prototype models which could be further developed upon to create a marketable product that could generate profitable returns on Plaintiffs' investments.

(f)  Defendants knew or should have known this representation was false because they either led or had a long association with the Lab Project and would have been familiar with the state of its research.

209.  In March 2022, Firmage stated that through further research and development his machine would be capable of hovering above the ground, powering both atmospheric and space flight, and possibly enabling interdimensional travel.

(a)  This representation was false.

(b)  Nothing Firmage had developed thus far had demonstrated the capabilities he described.

(c)  Firmage's concept for a propulsion system had been discredited by several scientists.

(d)  No amount of research and development would produce a machine with the capabilities he described.

(e)  The representation concerned a material fact in that it induced Plaintiffs to invest in the project.

(f)  Defendants knew or should have known this representation was false because they either led or had a long association with the Lab Project and would have been familiar with the state of its research.

210.  In March 2022, Firmage and Richards told Marmer that Firmage and associated entities had engaged theoretical physicist David Hestenes, Professor Emeritus at Arizona State University, whose scholarship focused on spacetime algebra, as a

technical advisor and promoter of their projects, and that Hestenes endorsed the science underlying Firmage's Lab Project.

(a) This representation was false.

(b) While Hestenes was involved in the project, he did not endorse the underlying science and disputed the notion that Firmage had made any progress towards developing new propulsion technology.

(c) The representation concerned a material fact as it altered the mix of information available to Plaintiffs in making their investment decisions and thereby induced them to invest.

(d) Specifically, it assured Plaintiffs that a reputable scientist was closely involved in developing the new propulsion technologies and had endorsed its potential to become a marketable product capable of generating profitable returns on Plaintiffs' investments.

(e) Defendants knew or should have known this representation was false because they either led or had a long association with Firmage's Lab Project.

(f) Defendants also knew or should have known this representation was false because they interacted with Hestenes directly and thus would have known the particulars of his role in the Lab Project and whether or not he had ever endorsed it.

211. In March 2022, Firmage and Richards told Marmer that Firmage and associated entities had signed two large government contracts to fund their research: one for the purchase of lifetime license rights to their technology at a price of $160 million paid out at $16 million a year over ten years, and one from the DOD valued at $200 million. The

28

existence of the government contract was reiterated on many occasions, including by both Richards and Firmage in mid-April 2022 and on June 21, 2022; by Richards on May 10, 2022; and by Firmage on July 28, 2022.

     (a) This representation was false.

     (b) No government contract was ever awarded, nor even offered, to Firmage and associated entities.

     (c) The representation concerned a material fact as it altered the mix of information available to Plaintiffs in making their investment decisions, and thereby induced them to invest.

     (d) Specifically, it provided assurance that Plaintiffs' investments were already secured, would generate returns imminently, and that Marmer's project was trusted and vetted by the DOD.

     (e) As leaders of Firmage's Lab Project, Defendants knew or should have known whether a government contract had been awarded or not.

     (f) Defendants also produced falsified checks and bank statements to corroborate their claims about the government contract.

     (g) Furthermore, Defendants made contradictory statements to different investors about the status of the purported government contract.

212. On May 10, 2022, Richards represented to Marmer that even if the government contracts fell through, Marmer's investments would enable Firmage to produce Version 1.0 of his propulsive device, which represented a significant step in their

research and development that would still make the Lab Project profitable, including by attracting significant levels of private funding from venture capital firms.

(a) This representation was false.

(b) Firmage was nowhere close to achieving that developmental milestone.

(c) The Lab Project was entirely based on questionable science.

(d) The lab project had no potential to become profitable under any scenario.

(e) The representation concerned a material fact as it altered the mix of information available to Plaintiffs in making their investment decisions and thereby induced them to invest.

(f) Specifically, it provided assurances that Plaintiffs' investments were safe and secure because there were alternate paths to the Lab Project's success, which was necessary to generate profitable returns for Plaintiffs.

(g) Based on his longtime affiliation with Firmage's Lab Project and the fact that he himself had lost money investing in it in the past, Richards knew or should have known that the project had no potential to attract venture capital funding.

213. In March 2022, Firmage and Richards told Marmer that as a prerequisite to the government contract awards, he needed to secure intellectual property ("IP") rights for the technology he was developing, which required a payment of $1 million into an escrow account. Firmage and Richards told Marmer that he was a few hundred thousand dollars short of funding the escrow account to obtain his IP rights.

(a) This representation was false.

(b) There was no government contract on offer in the first place.

(c) A few months earlier, Firmage and Richards told another investor they had already received the funds from one of the government contracts they later claimed to lack.

(d) Moreover, the money Plaintiffs provided to fund the purported escrow account was instead wired to several unknown Japanese entities.

(e) The representation concerned a material fact as it altered the mix of information available to Plaintiffs in making their investment decisions, thereby inducing them to invest.

(f) Specifically, it suggested that this threshold investment was required to unlock the greater returns initially promised.

(g) Defendants knew or should have known this representation was false, as shown by the conflicting statements they made to different investors.

(h) Defendants also knew or should have known that there was no escrow account based on their respective roles in Lab Project.

(i) Defendants' knowledge that this representation was false is further evidenced by the documents they produced showing that the money had been diverted elsewhere.

214. On June 21, 2022, Firmage and Richards told Marmer that the DOD contract had successfully closed and that $200 million had been deposited into Firmage's bank account, corroborated by checks and bank statements.

(a) This representation was false.

(b) There was no DOD contract.

31

(c) $200 million had not been deposited into Firmage's bank account.

(d) The checks and bank statements Defendants produced were forgeries.

(e) The representation concerned a material fact as it altered the mix of information available to Plaintiffs in making their investment decisions, thereby inducing them to invest.

(f) Specifically, it provided assurances that Plaintiffs' investments were secured by funds already in Firmage's possession, and the risk of loss was consequently very low.

(g) Defendants knew or should have known this representation was false, in part because they forged checks and bank statements to corroborate it.

### FRAUDULENT OMISSIONS

215. Richards and Firmage did not disclose that numerous previous investors in Firmage and associated entities—including Richards himself and the other Integral Initiatives Parties—had lost millions of dollars from their investments.

(a) This omission was material as it altered the mix of information available to Plaintiffs in making their investment decisions, specifically by concealing information indicating that the Lab Project had failed to generate profitable returns for past investors.

(b) Defendants knew or should have known of this omitted fact, as shown by the concerns past investors expressed to them about the legitimacy of Firmage's Lab Project.

(c) Moreover, Richards himself lost heavily investing in the Lab Project several years ago and made an agreement with Firmage whereby he would take a substantial cut of newly invested funds in order to recoup his own losses.

216. Richards and Firmage did not disclose that Plaintiffs' invested funds would be diverted to various other purposes.

(a) This omission was material as it altered the mix of information available to Plaintiffs in making their investment decisions; specifically, it concealed the fact that Plaintiffs' invested funds would be diverted to purposes which would not generate profitable returns.

(b) Richards and Firmage knew or should have known of this omitted fact, given that they personally made the decisions to divert funds.

217. Richards did not disclose that the Integral Initiatives Parties were given a substantial portion of all funds invested in Firmage and associated entities, including Plaintiffs' investments.

(a) This omission was material because it concealed a conflict of interest that, were Plaintiffs aware of it, would have prompted them to treat Richards' representations with appropriate skepticism and exercise greater care in making their investment decisions.

(b) Richards knew or should have known of this omitted fact, as shown by the agreement he signed which formed this arrangement, as well as his request that Plaintiffs pay half of their initial investment to Integral Initiatives.

218.  Richards, Firmage, and Hestenes did not disclose that Hestenes was receiving financial kickbacks for recruiting investors, including via the Icehouse scheme.

(a) This omission was material because it concealed a conflict of interest that, were Plaintiffs aware of it, would have prompted them to treat Hestenes' purported endorsement with appropriate skepticism and exercise greater care in making their investment decisions.

(b) Firmage and Hestenes knew or should have known of this omitted fact given that they made and executed these arrangements themselves.

(c) Richards also later admitted this omitted fact to Marmer.

219.  Richards and Firmage did not disclose that Firmage has a history of substance abuse, mental illness, and financial insecurity which seriously impede his ability to responsibly manage the lab and its resources.

(a) This omission was material as it altered the mix of information available to Plaintiffs in making their investment decisions; specifically, it concealed challenges in Firmage's personal life which, at a minimum, could impair his judgment in managing the Lab Project's affairs.

(b) Richards knew or should have known this omitted fact based on the duration of his relationship with Firmage and the extent to which he was involved in the Lab Project.

(c) Firmage knew or should have known this omitted fact about his own life.

220.  Richard and Firmage did not disclose that Firmage was heavily indebted to numerous creditors and diverted investment funds to pay off outstanding debts.

34

(a) This omission was material as it altered the mix of information available to Plaintiffs in making their investment decisions; specifically, it concealed a substantial risk factor to the financial stability of the Lab Project.

(b) Richards knew or should have known this omitted fact based on the duration of his relationship with Firmage and the extent to which he was involved in the Lab Project—and given that he was, himself, one of Firmage's creditors.

(c) Firmage knew or should have known this omitted fact about his own life.

221. Richards did not disclose that several former investors had expressed concerns about certain suspicious aspects of the investment scheme, including its apparent connections to international organized crime.

(a) This omission was material as it altered the mix of information available to Plaintiffs in making their investment decisions; specifically, it concealed information disputing the legitimacy of the investment scheme.

(b) Richards knew or should have known of this omitted fact, given that he was the one receiving such comments from past investors.

222. Defendants did not disclose that Firmage and the Integral Initiatives Parties were operating a Ponzi scheme, in which Hestenes, Collins, Menlove, and Toro also participated.

(a) This omission was material as it altered the mix of information available to Plaintiffs in making their investment decisions; specifically, it concealed the illegal nature of the investment scheme.

(b) Defendants Firmage and the Integral Initiatives Parties knew or should have known this omitted fact, as shown by the contract between them in which they devised the Ponzi scheme themselves (though they didn't label it as such). Defendant Hestenes knew or should have known this omitted fact, as shown by his recruitment of investors to the Lab Project while also stating it was not based on sound science and never had his endorsement. Defendants Collins, Menlove, and Toro knew or should have knoan this omitted fact by virtue of their relationships to Firmage and their associations with the Lab Project.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

(Federal Securities Fraud/§ 10(b) of the Securities Exchange Act and Rule 10(b)(5))

(Firmage, Science Invents, Richards)

223. Plaintiffs incorporate herein all other factual allegations of this Complaint.

224. As discussed above in paragraphs 203 through 218, Defendants made untrue statements of material facts and omitted to disclose material facts the disclosure of which was necessary to make statements that were not misleading.

225. Defendants' misrepresentations and omissions were made in connection with the sale of interests in Science Invents, which constitutes the sale of a security under federal law.

226. As further discussed above in paragraphs 203 through 218, Defendants made the misrepresentations and omissions to Plaintiffs knowing that they were false and misleading.

227. In the alternative, Defendants were reckless in not knowing that the misrepresentations and omissions were false and misleading.

228. Plaintiffs were all purchasers of interest in Firmage's Lab Project, under the guise of Science Invents.

229. As to Defendants' misrepresentations, Plaintiffs relied thereon in purchasing their interests.

230. As to Defendants' omissions, Plaintiffs' reliance is presumed because the omitted disclosures concerned matters of material fact that substantially altered the mix of information available to Plaintiffs.

231. Defendants' misrepresentations and omissions and Plaintiffs' reliance thereon in purchasing the securities directly and proximately caused injury to Plaintiffs, for which Plaintiffs are entitled to a judgment awarding damages in an amount to be proven at trial, but which may be measured by, among other things, the amount of the Plaintiffs' total investment—which is estimated to be at least $666,717—together with interest, less the residual value of the securities they received.

232. Plaintiffs are further entitled to treble damages, a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

**SECOND CAUSE OF ACTION**

(Sale of Unregistered Securities/§ 12(a)(1) of the Securities Act)

(Firmage, Science Invents, Richards, 21C, Integral Initiatives, Menlove, Toro)

233.  Plaintiffs incorporate herein all other factual allegations of this Complaint.

234.  Investment in Science Invents was a security as defined in 15 U.S.C. § 77b(a)(1) in that it involved investment in a common enterprise with the success of the venture dependent primarily upon the efforts of others, namely, Firmage and associated entities and individuals

235.  The interests in Science Invents which are the subject of this Complaint were not registered by the filing of a registration statement.

236.  At all material times, the Defendants made use of the means or instruments of communication in interstate commerce or the mails—including telephone lines, the internet, email transmissions over the internet, and the United States Postal Service ("USPS")—for the purpose of offering, selling, and delivering interests in Science Invents, in violation of § 5(a) and 5(c) of the Securities Act (15 U.S.C. §77e(a) and (c)).

237.  Pursuant to §12(a)(1) of the Securities Act (15 U.S.C. §77z-1(a)(1)), by reason of Defendants' violation, Defendants are liable to Plaintiffs in an amount equal to the consideration paid for such security with interest thereon, less the amount of any income received thereon upon the tender of such security. For purposes of this Cause of Action only, Plaintiffs hereby tender their investment interests in Firmage and

associated entities to Defendants upon receipt of the amount specified in this

paragraph, as may be proven at trial.

238.  In the alternative, Plaintiffs are entitled to an award of damages in an amount to

be proven at trial.

239.  In either case, Plaintiffs are further entitled to treble damages, a full recovery of

pre- and post-judgment interest, costs of court, attorneys' fees where recoverable

under contract or as consequential damages, and such further relief as the Court may

deem appropriate under the circumstances.

### THIRD CAUSE OF ACTION

(Control Person Liability Under the Securities Exchange Act)

(Firmage, Richards, Wilber, Bigelow)

240.  Plaintiffs incorporate herein all other factual allegations of this Complaint.

241.  The Defendants identified in Plaintiffs' First Cause of Action above are liable to

Plaintiffs under Chapter 2B of Title 15 of the United States Code, the Securities

Exchanges Act of 1934, and are referred to in this Cause of Action as the "Liable

Persons".

242.  At all times relevant to this Complaint, the Defendants identified in this Cause of

Action controlled the Liable Persons, as follows:

(a) Defendants were officers, directors, or other control persons of entities

that are Liable Persons.

(b) Defendants had the authority over the Liable Persons as employers, supervisors, or persons with the ability to affect the terms of the Liable Persons' employment or livelihood.

(c) Liable Persons willingly submitted to and complied with the instruction, direction, or authority of Defendants.

243.  With respect to their conduct and control of the Liable Persons relating to the matters addressed in the First Cause of Action, Defendants did not act in good faith and the acts of Defendants did directly or indirectly induce the acts of the Liable Persons which is the basis for the First Cause of Action.

244.  Pursuant to Section 20(a) of the Securities Exchange Act (15 U.S.C. § 78t(a)), Defendants are jointly and severally liable with and to the same extent as the Liable Persons, and Plaintiffs are therefore entitled to a Judgment against Defendants awarding damages in an amount to be proven at trial, which is the equivalent of any award determined under Plaintiffs' First Cause of Action.

245.  Plaintiffs are further entitled to treble damages, a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

### FOURTH CAUSE OF ACTION

(State Law Securities Violation: Sale by Unlicensed Agent or Broker-Dealer)

(Firmage, Richards, 21C, Integral Initiatives, Menlove, Toro)

246.  Plaintiffs incorporate herein all other factual allegations of this Complaint.

247.  The investments in Science Invents which are the subject of this Complaint constitute securities as defined by UTAH CODE ANN. § 61-1-13(ee) (West 2023).

248.  Defendants Firmage and Richards functioned as securities agents as defined by UTAH CODE ANN. § 61-1-13(b) (West 2023), in that they sold the investments in Science Invents to Plaintiffs.

249.  On information and belief, Defendants Firmage and Richards do not hold securities agent licenses issued by the State of Utah or any other State.

250.  Defendants 21C, Integral Initiatives, Menlove, and Toro functioned as securities broker-dealers as defined by UTAH CODE ANN. § 61-1-13(c) (West 2023), in that they effectuated the financial transactions involved with the sale of securities in Science Invents to Plaintiffs.

251.  On information and belief, Defendants 21C, Integral Initiatives, Menlove, and Toro do not hold securities broker-dealer licenses issued by the State of Utah or any other State.

252.  On information and belief, Defendants' violations described herein were reckless or intentional.

253.  Pursuant to UTAH CODE ANN. § 61-1-22(1) (West 2023), Defendants' unlicensed participation in the sale of securities to Plaintiffs entitles Plaintiffs to a judgment awarding damages in an amount to be proven at trial, but which may be measured by, among other things, three times the amount of Plaintiffs' total investment, together

with interest at a rate of 12% annually from the date of payment, less the residual value of the securities they received.

254.  Plaintiffs are further entitled to treble damages, a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## FIFTH CAUSE OF ACTION

(State Law Securities Fraud)

(Firmage, Science Invents, Richards)

255.  Plaintiffs incorporate herein all other factual allegations of this Complaint.

256.  The investments in Science Invents which are the subject of this Complaint constitute securities as defined by UTAH CODE ANN. § 61-1-13(ee) (West 2023).

257.  Under UTAH CODE ANN. § 61-1-1 (West 2023), Defendants were required to fully and fairly disclose all material facts that a reasonable investor would consider important in making investment decisions.

258.  In connection with the Defendants' sale and the Plaintiffs' purchase of investments in Science Invents, Defendants:

      (a) made untrue statements of material fact;

      (b) omitted material facts which, in the context of the statements they were made, were necessary to avoid misleading Plaintiffs; or

(c) otherwise engaged in conduct which defrauded or deceived Plaintiffs in violation of applicable provisions of state law.

259. Defendants engaged in the conduct violating applicable state laws with knowledge of their failure to make full and fair disclosures to Plaintiffs.

260. Plaintiffs did not know that Defendants' representations were false, nor were they aware of the material facts Defendants had omitted in their statements relating to Plaintiffs' purchase of securities.

261. As discussed above, Defendants' violations of applicable state statutes governing securities fraud were reckless or intentional.

262. In the alternative, Defendants' violations of UTAH CODE ANN. § 61-1-1(2) (West 2023) were negligent and Defendants exercised undue influence over Plaintiffs in soliciting their investments.

263. Pursuant to UTAH CODE ANN. § 61-1-22(1) (West 2023), Defendants' unlicensed participation in the sale of securities to Plaintiffs entitles Plaintiffs to a judgment awarding damages in an amount to be proven at trial, but which may be measured by, among other things, three times the amount of Plaintiffs' total investment, together with interest at a rate of 12% annually from the date of payment, less the residual value of the securities they received.

264. Plaintiffs are further entitled to treble damages, a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

**SIXTH CAUSE OF ACTION**

(Materially Aiding State-Law Securities Fraud)

(All Parties)

265.  Plaintiffs incorporate herein all other factual allegations of this Complaint.

266.  The Defendants identified in Plaintiffs' Fourth and Fifth Causes of Action above are liable to Plaintiffs under the applicable state statutes described above and are referred to in this Cause of Action as the "Liable Persons".

267.  At all times relevant to this Complaint, Defendants materially aided the Liable Persons in violating the applicable state securities laws by conduct including, but not limited to, the following:

(a) Defendants were officers, directors, or other control persons of entities that are Liable Persons, and authorized, ratified, endorsed, or participated in the conduct constituting the violation.

(b) As part of their employment, business, or commercial activity, and in exchange for payment or other compensation, Defendants provided information, services, labor, or funds which significantly advanced the Liable Persons' unlawful conduct or purposes with respect to Plaintiffs.

(c) Defendants otherwise engaged in conduct materially aiding the Liable Persons in accomplishing the unlawful sale of securities to the Plaintiffs.

268.  Defendants did not act in good faith, and Defendants knew or acted in reckless disregard of the facts in carrying out his conduct relating to the sale of securities to the Plaintiffs.

269.  Pursuant to UTAH CODE ANN. § 61-1-22(4) (West 2023), Defendants are jointly and severally liable with and to the same extent as the Liable Persons, and Plaintiffs are therefore entitled to a Judgment against Defendants awarding damages in an amount to be proven at trial, but which is the equivalent of any award determined under Plaintiff's Fifth or Sixth Causes of Action.

270.  Plaintiffs are further entitled to treble damages, a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## SEVENTH CAUSE OF ACTION

(Breach of Contract)

(Firmage and associated entities)

271.  Plaintiffs incorporate herein all other factual allegations of this Complaint.

272.  As discussed above in paragraphs 118 through 124, Plaintiffs entered into binding investment agreements with Defendants Firmage and associated entities.

273.  The agreements were all memorialized in writing, each signed by Defendant Firmage and the respective Plaintiff(s) lending the money in question.

274.  All investment agreements between Plaintiffs and Defendants were signed sometime during the period March through July of 2022.

275.  Most of the agreements specified due dates by which Firmage and associated entities were obligated to repay the money invested by Plaintiffs.

276.  These due dates varied by individual agreement, but the latest due date specified in any one agreement was August 5, 2022.

277.  Plaintiffs performed their contractual obligations under each of their investment agreements with Firmage and associated entities, in that they gave Firmage and associated entities the amount of money specified by each agreement.

278.  No portion of any investment has ever been repaid to any Plaintiff.

279.  In all cases where the investment agreement specified a due date for repayment, the due dates which Defendants agreed to have lapsed.

280.  Where due dates were specified by the controlling investment agreements, Defendants' failure to repay Plaintiffs by the respective due dates constitutes a breach of contract with Plaintiffs.

281.  Defendants' breaches of contract caused injury to Plaintiffs for which they are jointly and severally liable, and for which Plaintiffs are entitled to a judgment awarding damages in an amount to be proven at trial, but which may be measured by, among other things, the total amount of money invested by Plaintiffs where Defendants agreed to a due date for repayment, together with interest in accordance with the terms of the respective investment agreements.

282. Plaintiffs are further entitled to treble damages, a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

### EIGHTH CAUSE OF ACTION

(Fraudulent Misrepresentation)

(Firmage, Science Invents, Richards, 21C, Integral Initiatives)

283. Plaintiffs incorporate herein all other factual allegations of this Complaint.

284. Defendants had a duty to fairly and accurately disclose all material facts related to Firmage's Lab Project, its activities, and the viability of the investments solicited. This duty arose from:

(a) Defendants' superior knowledge of the material facts;

(b) Defendants' Pecuniary interest in the transactions at issue; and

(c) Defendants' Affirmative statements made to Plaintiffs.

285. In connection with the Plaintiffs' investments in Science Invents, Defendants misrepresented presently existing material facts to Plaintiffs, as described above in paragraphs 204 through 210.

286. Defendants' misrepresentations were made knowingly, or recklessly with knowledge that there was insufficient information upon which to base such representations. Specifically, Plaintiffs allege:

(a) Defendants other than Firmage had close business and/or personal relationships with Firmage lasting several years and were aware of his personal and financial challenges.

(b) Defendants other than Firmage were aware of Firmage's failure to perform certain obligations under past investment agreements, including those they themselves had made with Firmage.

(c) Several former investors told Richards that they reasonably suspected Firmage was diverting investment funds to be used for various purposes other than those for which the funds were intended.

(d) Defendants Richards and Firmage made representations about government contracts to past investors that contradicted those they later made to Plaintiffs.

(e) Defendants the Integral Initiatives Parties, Hestenes, and Toro received or enjoyed substantial benefits from their participation in the Science Invents Ponzi scheme, including the receipt of compensation in amounts substantially greater than customary practice in similar transactions.

287. Defendants made the misrepresentations for the purpose of inducing Plaintiffs to act in making investments in Science Invents.

288. Plaintiffs relied on Defendants' misrepresentations and were thereby induced to act in making investments in Science Invents.

289. Plaintiffs acted reasonably and justifiably in all ways and were genuinely unaware of the actual truth being concealed from them.

290.  By reason of Plaintiffs' reliance on Defendants' misrepresentations in investing in Science Invents, Plaintiffs have suffered injury and damage in an amount to be proven at trial, but which may be measured by, among other things, the difference between the value of the investment received and the value they would have received if the representations were true. In the alternative, damages may be measured by the amount of the Plaintiffs' investment, together with interest, less the residual value of the securities they received.

291.  Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## NINTH CAUSE OF ACTION

### (Fraudulent Nondisclosure)

### (Firmage and associated entities, Richards, 21C, Integral Initiatives)

292.  Plaintiffs incorporate herein all other factual allegations of this Complaint.

293.  Defendants had a duty to fairly and accurately disclose all material facts related to Firmage's Lab Project, its activities, and the viability of the investments solicited. This duty arose from:

(a) Defendants' superior knowledge of the material facts;

(b) Defendants' Pecuniary interest in the transactions at issue; and

(c) Defendants' Affirmative statements made to Plaintiffs.

294.  As discussed above in paragraphs 211 through 218, Defendants failed to disclose material facts which they were under a duty to disclose in order to avoid misleading Plaintiffs.

295.  Defendants' omissions were made knowingly.

296.  Defendants omitted the material facts for the purposes of inducing Plaintiffs to act in making investments in Science Invents.

297.  Plaintiffs relied on Defendants' omissions and were thereby induced to act in making investments in Science Invents.

298.  Plaintiffs acted reasonably and justifiably in all ways and were genuinely unaware of the actual truth being concealed from them.

299.  By reason of Plaintiffs' reliance on Defendants' omissions of material facts in investing in Science Invents, Plaintiffs have suffered injury and damage in an amount to be proven at trial, but which may be measured by, among other things the amount of the Plaintiffs' investment, together with interest, less the residual value of the securities they received.

300.  Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## TENTH CAUSE OF ACTION

### (Negligent Misrepresentation)

(Firmage, Science Invents, Richards, 21C, Integral Initiatives)[3]

301. Plaintiffs incorporate herein all other factual allegations of this Complaint.

302. Defendants had a duty to fairly and accurately disclose all material facts related to Lab Project, its activities, and the viability of the investments solicited. This duty arose from:

> (a) Defendants' superior knowledge of the material facts;
>
> (b) Defendants' Pecuniary interest in the transactions at issue; and
>
> (c) Defendants' Affirmative statements made to Plaintiffs.

303. In connection with the Plaintiffs' investments in Science Invents, Defendants misrepresented presently existing material facts to Plaintiffs, as described above.

304. Defendants' misrepresentations were made carelessly or negligently, with the expectation that Plaintiffs would rely and act upon such statements.

305. Plaintiffs relied on Defendants' misrepresentations and were thereby induced to act in making investments in Science Invents.

306. Plaintiffs acted reasonably and justifiably in all ways and were genuinely unaware of the actual truth being concealed from them.

307. By reason of Plaintiffs' reliance on Defendants' negligent misrepresentations in investing in Firmage's Lab Project, Plaintiffs have suffered injury and damage in an amount to be proven at trial, but which may be measured by, among other things, the difference between the value of the investment received and the value they would have

---

[3] For Defendants identified in the First Cause of Action, this claim is asserted in the alternative.

received if the representations were true. In the alternative, damages may be measured by the amount of the Plaintiffs' investment, together with interest, less the residual value of the securities they received.

308. Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## ELEVENTH CAUSE OF ACTION

### (Breach of Fiduciary Duty)

(Firmage, Science Invents, Richards, 21C, Integral Initiatives)

309. Plaintiffs incorporate herein all other factual allegations of this Complaint.

310. Defendants owed Plaintiffs a fiduciary duty of care and loyalty due to circumstances of the relationships between the parties including the following:

(a) Defendants had or held themselves out as having superior skill, knowledge, training, and expertise concerning all aspects of the transactions that are the subject of this Complaint.

(b) Defendants expected Plaintiffs would place particular trust and confidence in Defendants and affirmatively invited and encouraged Plaintiffs to rely upon their judgment and skill with respect to the transactions that are the subject of this Complaint.

(c) Defendants acted in the capacity of a licensed securities agent or performed duties on behalf of the Plaintiffs consistent with acting in that capacity and for which a securities license is required.

(d) Defendants otherwise acted as agents of the Plaintiffs in matters concerning the investment in Science Invents.

(e) Defendants received funds from Plaintiffs which were to be held, managed, and invested for the sole benefit of the Plaintiffs.

(f) Defendants received substantial compensation from Plaintiffs or from the funds paid by Plaintiffs in connection with Plaintiffs' investments, including funds associated with the receipt and management of the proceeds of Plaintiffs' investments.

(g) By virtue of their shared membership in a close-knit intellectual community, as well as Plaintiffs' experience and knowledge, Defendants and Plaintiffs were in an unequal bargaining position in circumstances where all parties would necessarily intend that Plaintiffs would put particular trust and reliance in Defendants.

311. Defendants breached their fiduciary duty to the Plaintiffs by conduct including, but not limited to, the following:

(a) Making the misrepresentations and omissions that are the subject of the First Cause of Action.

(b) Failing to safeguard Plaintiffs' invested funds or otherwise causing or allowing funds paid by the Plaintiffs to be diverted from their intended purpose and dissipated or used for purposes not benefiting Plaintiffs.

53

(c) Charging or receiving excessive commissions, referral fees or compensation.

(d) Failing to advise or notify Plaintiffs of the commissions, referral fees, or compensation that they or others would receive in connection with Plaintiffs' investment.

(e) Steering Plaintiffs toward investments that provided greater compensation to Defendants than other potential investments, without regard to the risks of such investments or the suitability of the investments for Plaintiffs.

(f) Failing to conduct sufficient and reasonable due diligence inquiries concerning the investments in Science Invents prior to selling the investment to Plaintiffs.

312. Defendants' breaches of fiduciary duty directly and proximately caused injury to Plaintiffs, for which Plaintiffs are entitled to a judgment awarding damages in an amount to be proven at trial, but which may be measured by, among other things, the amount of the Plaintiffs' total investment, together with interest, less the residual value of the securities they received.

313. Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## TWELFTH CAUSE OF ACTION

(Constructive Fraud)

(Firmage, Science Invents, Richards, 21C, Integral Initiatives)

314.  Plaintiffs incorporate herein all other factual allegations of this Complaint.

315.  As discussed at various points above, Defendants cultivated a confidential relationship between themselves and Plaintiffs with respect to the transactions which are the subject of this complaint. This relationship was based primarily on their shared affiliation with the Integral Theory Community.

316.  As a result of the confidential relationship between the parties, Plaintiffs were induced to relax the care and vigilance they might ordinarily have exercised had they not received assurances that Defendants' experience, skill, investigation, and familiarity with Science Invests would protect the Plaintiffs' interests.

317.  Defendants had a duty to accurately disclose material facts arising from the confidential relationship between the parties.

318.  Despite this duty, Defendants made numerous misrepresentations to Plaintiffs in soliciting their investments in Firmage's Lab Project, as discussed above in paragraphs 203 through 210.

319.  Defendants also failed to disclose material facts to Plaintiffs concerning the transactions which are the subject of this Complaint, as discussed above in paragraphs 211 through 218.

320. Defendants' failure to disclose duty directly and proximately caused injury to Plaintiffs, for which Plaintiffs are entitled to a judgment awarding damages in an amount to be proven at trial, but which may be measured by, among other things, the amount of the Plaintiffs' total investment, together with interest, less the residual value of the securities they received.

321. Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## THIRTEENTH CAUSE OF ACTION

(Conversion)

(Firmage and associated entities, Richards, 21C, Integral Initiatives)

322. Plaintiffs incorporate herein all other factual allegations of this Complaint.

323. Defendants received a portion of the proceeds of Plaintiffs' investments with knowledge that such funds were to be used by Science Invents.

324. Defendants knowingly and intentionally diverted the Plaintiffs' funds to other purposes, including recouping their own prior losses and making payments to numerous unknown individuals and entities, consistent with the operation of a Ponzi scheme.

325. Defendants' diversion of funds constitutes a conversion or fraudulent misappropriation of Plaintiffs' property, including but not limited to the funds

themselves, Plaintiffs' equitable interest in the benefit of the funds, and Plaintiffs'

collective interest in application of the funds consistent with the investment

agreements.

326.  Defendants' conversion or fraudulent misappropriation of Plaintiffs' property

directly and proximately caused injury to Plaintiffs, for which Plaintiffs are entitled to

a judgment awarding damages in an amount to be proven at trial, but which may be

measured by, among other things, the amount of the Plaintiffs' total investment,

together with interest, less the residual value of the securities they received.

327.  Plaintiffs are further entitled to a full recovery of pre- and post-judgment

interest, costs of court, attorneys' fees where recoverable under contract or as

consequential damages, and such further relief as the Court may deem appropriate

under the circumstances.

### FOURTEENTH CAUSE OF ACTION

(Civil Conspiracy)

(Firmage and associated entities, Integral Initiatives Parties, 21C, Hestenes, Toro)

328.  Plaintiffs incorporate herein all other factual allegations of this Complaint.

329.  As alleged at various points above, including Plaintiffs' Sixth Cause of Action,

Defendants Firmage and associated entities, the Integral Initiatives Parties, and

Hestenes combined to defraud Plaintiffs and numerous other investors by

perpetuating a Ponzi scheme built around Firmage's failed Lab Project.

330.  Defendants 21C and Toro combined with Defendant Firmage to receive money transfers from Plaintiffs in furtherance of the Ponzi scheme, retaining a portion of the funds they handled as compensation.

331.  The object of Defendants' actions was to enrich themselves by fraudulently inducing Plaintiffs to invest large sums of money in a project with zero potential for success and diverting the invested funds for their own purposes, leaving Plaintiffs with zero return on their investments.

332.  There was a meeting of the minds between Defendants to accomplish the object of the conspiracy where .

333.  There was a meeting of the minds between Defendants Firmage and associated entities and the Integral Initiatives parties where the Integral Initiatives parties received a 50% commission on all investment funds obtained through their recruitment efforts.[4]

334.  There was a meeting of the minds between Defendants Firmage and associated entities and Hestenes where Hestenes would allow his name and reputation to be used by others to bolster the Lab Project's credibility despite his knowledge that the underlying science for the Lab Project was flawed, in exchange for financial kickbacks.

(a) Hestenes also recruited at least one other nonparty investor, in or around February 2022.

---

[4] *See* Exhibit A.

335. There was a meeting of the minds between Defendants Firmage and associated entities, 21C, and Toro, to accomplish their object where they cooperated to route a portion of Plaintiffs' investment funds through Defendants 21C and Toro in exchange for a commission.

336. Each of the named Defendants committed one or more overt acts in furtherance of the object of the conspiracy.

        (a) Defendants Firmage and Richards induced Plaintiffs into investing in the Lab Project—in part by using Defendant Hestenes' name and reputation as an endorsement of its legitimacy.

        (b) All named Defendants participated in transactions involving Plaintiffs' investments, accepted portions of the proceeds, or were otherwise unjustly enriched thereby.

337. As a result of the civil conspiracy between the named Defendants, Plaintiffs have been damaged in an amount to be proven at trial, but which may be measured by, among other things, the amount of the Plaintiffs' total investment, together with interest, less the residual value of the securities they received.

338. Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

**FIFTEENTH CAUSE OF ACTION**

(Aiding and Abetting Tortious Conduct)

(All parties)[5]

339.  Plaintiffs incorporate herein all other factual allegations of this Complaint.

340.  As set forth in the previous Causes of Action above, certain Defendants have engaged in conduct constituting a tort for which Plaintiffs are entitled to recover damages.

341.  Defendants Firmage and associated entities and Richards knowingly participated and substantially assisted in tortious conduct by distributing investor marketing materials concerning Science Invents, referring Plaintiffs to Firmage and Science Invents, recommending investment in Science Invents, or providing assurances to Plaintiffs concerning their participation, all while concealing from Plaintiffs and other parties Firmage and associated entities's insolvency and failures to perform obligations to investors, and supporting and creating the façade of Firmage and associated entities' successes when they were insolvent, losing money, and operating as a Ponzi scheme.

342.  Defendants Firmage and Richards knowingly participated and substantially assisted in tortious conduct by selling and closing sales of investment transactions and

---

[5] For Defendants identified in the First through Fourth Causes of Action, as well as def cause of action, this claim is asserted in the alternative.

causing a substantial portion of Plaintiffs' investment funds to be diverted to various unrelated purposes.

343.  Defendant Collins knowingly participated and substantially assisted in tortious conduct by providing assurances to Plaintiffs concerning their participation in the Lab Project while concealing from Plaintiffs and other parties Firmage and associated entities's insolvency and failures to perform obligations to investors, thereby supporting and creating the façade of Firmage and associated entities' successes when, in fact, they were insolvent, losing money, and operating as a Ponzi scheme.

344.  Defendants 21C, Integral Initiatives, Menlove, and Toro knowingly participated and substantially assisted in tortious conduct by receiving and disbursing Plaintiffs' invested funds and carrying out instructions from Firmage and Richards with respect to the transactions which are the Subject of this complaint.

345.  Defendants the Integral Initiatives Parties knowingly participated and substantially assisted in tortious conduct by devising the Ponzi scheme and perpetuating the fraud as a means of recouping their own investment losses from participating in the Lab Project.

346.  Defendants Wilber and Hestenes participated and substantially assisted in tortious conduct by allowing their reputations to be used as an endorsement of the viability of Science Invents in order to lure Plaintiffs and other victims into the Ponzi scheme.

347.  Defendants engaged in such conduct with knowledge of the underlying tortious conduct in that they were familiar with Firmage and associated entities and were aware

of their operations, financial weakness, and failures to meet obligations by virtue of long-term relationships with them that included direct collaboration, access to financial information, and observation of their failures.

348. Defendants the Integral Initiatives Parties, 21C, Hestenes, and Toro knowingly shared in the benefits of the investments in Firmage and associated entities, including the receipt of salary, wages, or other payments for work associated with them or with funds obtained through their schemes.

349. Defendants' aiding and abetting the underlying tortious conduct caused injury to Plaintiffs for which they are jointly and severally liable, and for which Plaintiffs are entitled to a judgment awarding damages in an amount to be proven at trial, but which may be measured by, among other things, the amount of the Plaintiffs' total investment, together with interest, less the residual value of the securities they received.

350. Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

**SIXTEENTH CAUSE OF ACTION**

(Unjust Enrichment)

(Firmage and associated entities, Integral Initiatives Parties, 21C, Hestenes, Toro)

351. Plaintiffs incorporate herein all other factual allegations of this Complaint.

352. Plaintiffs conferred a benefit on Defendants by making their investments in Science Invents.

353. Defendant Richards received a benefit from Plaintiffs in the form of commissions or other compensation paid from the proceeds of the sale transaction; access to and direct use of the identifiable proceeds of the investment; and perpetuation of Firmage and associated entities's Ponzi scheme.

354. Defendants the Integral Initiatives Parties, Hestenes, 21C, and Toro received benefits in the form of salary, continued employment, or other payments or consideration from Firmage and associated entities that they would not otherwise have received without the benefits derived from Plaintiffs.

355. Defendants appreciated, acknowledged, or had knowledge of the benefits conferred upon them as they directly received money from the proceeds of the Plaintiffs' investments or otherwise acted in concert to Firmage's schemes, obtain and use funds from Science Invents investors, and divert invested money to purposes not benefitting Plaintiffs.

356. Under the circumstances, equity and justice demand that Defendants not be permitted to retain the benefits conferred upon them by Plaintiffs without compensating Plaintiffs therefor.

357. Defendants' unjust enrichment entitles Plaintiffs to a judgment awarding damages in an amount to be proven at trial, but which may be measured by the total amount of benefit that the Plaintiffs have conferred upon Defendants, which is believed to be at least $666,717.

358.  Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## PUNITIVE DAMAGES

359.  On the First through Fifteenth and Twentieth Causes of Action set forth above, Plaintiffs allege that Defendants' conduct was willful, malicious, or intentionally fraudulent, or that it manifested a knowing and reckless indifference toward, and disregard to, the rights of the Plaintiffs. Pursuant to UTAH CODE ANN. § 78B-8-201 (West 2023) and other applicable law, Plaintiffs are therefore entitled to an award of punitive damages in an amount sufficient to punish the Defendants and to deter similar conduct by others in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants for such damages as are reasonable in the circumstances, as follows:

1.  For unjust enrichment and a judgment ordering disgorgement of the invested amounts.

2.  For actual and punitive damages in an amount to be proven at trial, including double and treble damages where permitted by law, plus interest as set forth in the applicable statutes.

3. For pre-judgment interest on the damages assessed in the matter, pursuant to

Utah Code Ann. § 78B-5-824 (West 2023).

4. For all costs of court.

5. For attorney fees as may be appropriate and allowable by law.

6. For such other and further relief and damages as are just, equitable, or proper in

the circumstances and available under the law.

RESPECTFULLY SUBMITTED this 30th day of August, 2023.

Deiss Law PC

_/s/ Andrew G. Deiss_
Andrew G. Deiss
*Attorney for Plaintiffs*